Fourth Division
 May 22, 1997

No. 1-96-2115

IN THE INTEREST OF K.G., D.G., Minors, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Respondents-Appellants, ) COOK COUNTY.
_______________________________________ )
THE PEOPLE OF THE STATE OF ILLINOIS, ) 
 )
 Petitioner-Appellant, )
 )
 v. )
 )
KIMBERLY M. and DARIEN G., SR., ) HONORABLE
 ) CAMILLE WILLIS,
 Respondents-Appellees. ) JUDGE PRESIDING.

 PRESIDING JUSTICE WOLFSON delivered the opinion of the 

court:

 The decision of the trial judge in this case is one of the
most arduous and troubling decisions any judge can reach.
 The State's Attorney filed a petition alleging two children
had been neglected and abused by their mother. The petition
asked the judge in the Child Protection Division of the Cook
County circuit court to declare the children wards of the court.
After hearing evidence and arguments, the trial court dismissed 
the petition, finding no evidence the children were neglected or
abused. The Cook County Public Guardian and the State's Attorney
appeal the trial court's decision.
 The only issue on appeal is whether the trial court's
decision is against the manifest weight of the evidence. We
conclude it is not.
FACTS
 Sometime before 1994, the Department of Children and Family
Services (DCFS) had its first contact with Kimberly M. DCFS
received a report that Kimberly was not providing adequate
supervision for her children, Darion G. (D.G.)(born April 6,
1984) and Kaniesha G. (K.G.) (born August 3, 1988). Though this
report was founded, there apparently was no further intervention
until Kimberly's third child, Christine M., was born on June 28,
1994. At that time DCFS received a report that the newborn
Christine M. had tested positive for exposure to cocaine.
 Though Christine was born a drug-exposed infant, DCFS did
not file petitions for the adjudication of wardship in the
interest of Christine or her brother (D.G.) and sister (K.G.)
alleging that they were abused or neglected as a result of
Kimberly's use of drugs. However, Tarsha McCormick, a social
worker with a private agency, Chicago Commons, became involved
with Kimberly and her children.
 McCormick received the referral to work with Kimberly in
October 1994. Her first visit with Kimberly was on October 31,
1994, at Kimberly's home. Kimberly and her three children lived
with Kimberly's mother, uncle, sister, and her sister's three
children. When taking a social history from Kimberly, McCormick
learned that Kimberly was using cocaine 2-3 times per week. 
Kimberly said she took drugs when she was alone and when she was
with others. Her drug usage, she said, was in response to
depression and stress.
 The service plan that McCormick developed for Kimberly was
based on her admitted drug usage. It required (1) bi-monthly
urine drops, (2) inpatient drug treatment if her urine tested
positive for cocaine, and (3) regular medical check-ups for
Christine.
 McCormick was aware that Kimberly had no crib for Christine. 
Kimberly was sleeping with Christine on a couch. McCormick
requested monetary assistance from her agency to assist Kimberly
in the purchase of a crib for Christine. A grant of $60 was
approved. McCormick took Kimberly to obtain the check and to
shop for a crib. None was purchased at that time, however,
because they could not find a crib for $60.
 Although the service plan was drawn up in December 1994, the
first urine drop was not obtained until March 1995. McCormick
apparently attempted one home visit in January, but no one was
home. This first urine drop tested positive for cocaine. For
this reason, the new (April) service plan set a goal of having
Kimberly enroll in a drug treatment program. Referrals were
made, but Kimberly did not enroll because the program was not
covered by her insurance.
 At the April home visit, when the new service plan was
developed with Kimberly, McCormick asked Kimberly if she was
pregnant. Kimberly said "she hoped she wasn't." McCormick made
no other home visits between April and July because she was
receiving training during this period. Other workers handled her
cases. Someone apparently saw Kimberly in May because a urine
drop was obtained on May 15, 1995. This urine drop was negative.
 Kimberly gave birth to another cocaine-exposed infant,
Derrick G., on July 12, 1995. DCFS received a report and was
aware that this was Kimberly's second incident of a drug-exposed
birth. Still, no efforts were made to remove the children and no
petitions for adjudication of wardship were filed. The DCFS
investigator assigned to the case recommended that Kimberly
receive in-patient drug treatment.
 Kimberly refused to attend an in-patient program because she
was unable to find someone to care for her children while she was
away. Instead, she enrolled in an intensive 28-day, out-patient
program, "BRASS," in August 1995. She completed this program
satisfactorily, and the next two urine drops, taken on October 5,
1995, and January 1, 1996, were negative.
 McCormick found that the children were generally neat,
clean, and appropriately dressed. In fact, McCormick said that
in November 1995 Chicago Commons was considering closing
Kimberly's case.
 On December 26, 1995, however, a tragedy occurred. Five-
month-old Derrick G. died of asphyxiation. In the investigation
following Derrick's death, Kimberly explained that on December
25, 1995, she went to sleep on the couch with Derrick lying on
her chest and Christine at the foot of the couch. Kimberly
admitted that she drank two "shots" of eggnog with brandy in it
sometime during the evening of December 25, 1995. The next
morning, when Kimberly woke up, she realized that Derrick was not
breathing. His body had slipped down between her and the couch,
underneath her arm.
 Kimberly ran to her uncle's room for help. Her uncle called
911 for an ambulance, while her mother tried to perform CPR on
Derrick. When the ambulance arrived, Derrick was taken to Wyler
hospital, where he was declared dead on arrival.
 Following Derrick's death, petitions for the adjudication of
wardship were filed on January 5, 1996, in the interest of
Kimberly's three remaining children.
 K.G. and D.G. were alleged to be neglected due to injurious
environment (705 ILCS 405/2-3(1)(c) (West 1994)), and abused due
to substantial risk of physical injury (705 ILCS 405/2-3(2)(ii)
(West 1994)). The basis for these allegations was:
 "Mother delivered two of her children that tested
 positive for substance abuse at birth. Mother
 currently has a death case pending. On 12/26/95
 minor's sibling died while in the care and custody of
 the mother."
 The petition on Christine M. alleged that she was neglected
because, as a newborn infant, her blood had tested positive for
the presence of cocaine.
 The State asked for temporary custody of the children,
stating that "the severity of injury or seriousness of the
allegations makes it too risky to leave the minor(s) in the
home." After a temporary custody hearing, the court removed the
children from the home and ordered that Kimberly's visits with
the children be supervised until the cause of Derrick's death
could be determined.
 Subsequently, a trial was held on the petitions for
adjudication of wardship. Tarsha McCormick testified at the
trial and told about her involvement with the family since
October 1994.
 Antonio Stone, a DCFS worker assigned to investigate
Derrick's death, testified that on December 27, 1996, she spoke
with Kimberly, the children, and the baby's father (Derrick G.
Sr.). The father had been in Kimberly's home the night of
December 25, 1995. The father verified that Kimberly had gone to
sleep on the couch with the baby on her chest, but noted that
Derrick usually slept in a crib. Stone also testified that
Darion G. told her that his mother had been drinking beer on
December 25, 1995, and was drunk when she fell asleep on the
couch with the baby on her chest.
 On cross-examination, however, Stone admitted that she
checked all of the children for signs of physical abuse and found
nothing; that Darion G. told her he never saw anyone use drugs in
his house; and that Derrick G. Sr. (the father) told Stone that,
to his knowledge, Kimberly was not using drugs and was taking
good care of the children.
 Carlos Latimer, a death investigator for the Cook County
Medical Examiner's Office, was working on a study on Chicago
Infant Mortality in conjunction with the Loyola Medical
University. He testified that he went to Kimberly's home to
discuss Derrick's death. Kimberly had been cooperative. She
admitted that she had only two prenatal doctor visits before
Derrick was born and that she smoked cigarettes, drank, and took
cocaine while she was pregnant with him.
 Kimberly re-enacted her positioning on the couch on the
morning she found Derrick not breathing. Using a prop doll as
Derrick, Kimberly showed how she found Derrick pressed against
her breast under her arm. Latimer took several photographs
showing what Kimberly said was her and Derrick's positions on the
couch. These photos were admitted into evidence. Latimer
testified that he measured the couch and found it to be 157 cms
by 87 cms.
 The certified medical examiner's report, which concluded
that Derrick G.'s death by asphyxiation had been accidental, was
admitted into evidence. In addition, Kimberly presented an
expert witness, Dr. Sheldon, the Director of Sleep Disorders at
Children's Hospital. Dr. Sheldon concurred with the medical
examiner's conclusion that Derrick's death was an accidental
asphyxia due to overlay. He testified that "co-sleeping"
(defined as two persons sleeping on the same surface) was an
acceptable practice that was not inherently dangerous or
neglectful. In fact, he claimed that studies indicated that co-
sleeping with adults may be beneficial to an infant's sleeping
patterns. He concluded that a parent co-sleeping with an infant
was not evidence of neglect or abuse and that he, himself, had
allowed his own child to sleep on his chest.
 Kimberly M. was called as an adverse witness by the State. 
When asked if she used cocaine, she invoked her Fifth Amendment
right and refused to answer.
 The trial court found:
 1. There was no credible evidence that Kimberly was still
 using drugs on the date that Derrick died;
 2. The evidence showed that Kimberly did not intentionally
 cause Derrick's death;
 3. There was no evidence that Kimberly failed to exercise
 the care that circumstances required on December 26,
 1995; and
 4. Kimberly's failure to purchase a crib due to lack of
 funds did not establish abuse or neglect.
 As to K.G. and D.G., the court found no evidence to support
a finding that they were abused or neglected. The petitions for
adjudication of wardship regarding K.G. and D.G. were dismissed.
 As to Christine M., however, the court found there was no
statute of limitations on the filing of a petition for
adjudication of wardship under the Juvenile Court Act and, based
on Christine being born drug-exposed on June 28, 1994, she was a
neglected child under the Act. 
 The Office of the Cook County Public Guardian, representing
the minors, K.G. and D.G., appeals the order as it pertains to
K.G. and D.G. The order as it pertains to Christine M. is not
part of the appeal.
 The State's Attorney filed a motion for leave to adopt the
brief of the minors. Leave was granted.
 Kimberly M., represented by private counsel, filed a brief
in response to the Public Guardian's appeal, asking that this
court affirm the trial court's ruling. Derrick G., Sr.,
represented by the Public Defender's Office, moved to adopt
Kimberly's brief. This motion was granted.
 The State, through its motion to adopt the Public Guardian's
brief, has seen fit to inform us that new petitions for
adjudication of wardship of K.G. and D.G. were filed while this
appeal was pending. Our decision in this case is based solely
on the record before the trial court when it dismissed the
State's petition.
DECISION
 A child, Derrick G., died while in the care of his mother. 
In addition, he and one of his siblings, Christine M., tested
positive for the presence of the illegal substance, cocaine, at
birth. We know that the mother, Kimberly M., used cocaine while
she was pregnant. The question is whether these facts, which
were the only factual allegations in the petitions for
adjudication of wardship, provide sufficient evidence to require
a finding that Derrick G.'s siblings, K.G. and D.G., were exposed
to a substantial risk of physical injury or an injurious
environment. 
 The trial court found that the facts did not prove that
Kimberly created "a substantial risk of physical injury to such
minor[s], by other than accidental means, which would likely
cause death, disfigurement, impairment of emotional health, or
loss or impairment of any bodily function" (705 ILCS 405/2-
3(2)(ii) (West 1994)) or that the "environment [was] injurious to
[their] welfare" (705 ILCS 405/2-3(1)(b) (West 1994)). 
 We begin by noting that the best interests of the child is
the paramount consideration whenever a petition for adjudication
of wardship or any proceeding is brought under the Juvenile Court
Act. In re B.C., 262 Ill. App. 3d 906, 635 N.E.2d 570 (1994); In
re B.M., 248 Ill. App. 3d 76, 79, 618 N.E.2d 374 (1993). It is
the State's burden to prove the neglect or abuse alleged in any
wardship petition by a preponderance of the evidence. In re
B.T., 204 Ill. App. 3d 277, 280, 561 N.E.2d 1269 (1990). 
Preponderance of the evidence is that amount of evidence that
leads a trier of fact to find that the fact at issue is more
probable than not. In re C.C., 224 Ill. App. 3d 207, 586 N.E.2d
498 (1991).
 At an adjudicatory hearing the trial court's first
responsibility is to determine whether the minor is abused,
neglected, or dependent. 705 ILCS 405/2-18(1) (West 1994). The
concept of "neglect" is not static. It has no "fixed and
measured meaning," but draws its definition from the individual
circumstances presented in each case. In re Stilley, 66 Ill. 2d
515, 520, 363 N.E.2d 820 (1977); In re A.D.R., 186 Ill. App. 3d
386, 391, 542 N.E.2d 487 (1989). As a general rule, however, it
is "the failure to exercise the care that circumstances justly
demand and encompasses both wilful and unintentional disregard of
parental duty." In the Interest of M.K., 271 Ill. App. 3d 820,
649 N.E.2d 74 (1995).
 Neglect based on "injurious environment" is an "amorphous
concept" not readily susceptible to definition. In re S.D., 220
Ill. App. 3d 498, 502, 581 N.E.2d 158 (1991). Each case must be
judged on its own merits, based on the particular circumstances
present. In re Ashley F., 265 Ill. App. 3d 419, 638 N.E.2d 368
(1994).
 A trial court's determination of a neglect issue is entitled
to great deference and will not be disturbed on appeal unless
contrary to the manifest weight of the evidence. In re A.D.W,
278 Ill. App. 3d 476, 482, 663 N.E.2d 58 (1996). A trial court's
finding is against the manifest weight of the evidence if a
review of the record clearly demonstrates that the opposite
result would be the proper one. In re T.B., 215 Ill. App. 3d
1059, 1062, 574 N.E.2d 893 (1991). After all, "the trial court
is in a much better position than is this court to observe the
witnesses, assess credibility, and weigh the evidence." In re 
T.B., 215 Ill. App. 3d at 1062.
 Certain circumstances constitute prima facie evidence of
abuse or neglect. Proof that a minor has a medical diagnosis at
birth of withdrawal symptoms from narcotics or barbiturates is
prima facie evidence of neglect; proof that a parent repeatedly
used a drug to the extent that it has or would ordinarily have
the effect of producing in the user a substantial state of
stupor, unconsciousness, intoxication, hallucination,
disorientation, or incompetence, or a substantial impairment of
judgment, or a substantial manifestation of irrationality, shall
be prima facie evidence of neglect; proof that a parent
repeatedly used a controlled substance in the presence of the
minor or a sibling of the minor is prima facie evidence of
neglect; and proof that a newborn infant's blood, urine, or
meconium contains any amount of controlled substance, or a
metabolite of a controlled substance, is prima facie evidence of
neglect. 705 ILCS 405/2-18(2)(d), (f), (g), and (h) (West 1994). 
 In addition, proof that one minor is abused, neglected, or
dependent is admissible evidence on the issue of abuse, neglect,
or dependency of any other minor for whom the parent is
responsible. In re David D., 202 Ill. App. 3d 1090, 1093, 560
N.E.2d 966 (1990). 
 A parent's behavior toward one minor may be considered when
deciding whether a sibling is exposed to an injurious
environment. In re S.M., 171 Ill. App. 3d 361, 366, 525 N.E.2d
565 (1988). 
 Failure of a parent to protect a child from harm or provide
him with a safe and nurturing home "falls within the concept of
statutory neglect." In the Interest of M.K., 271 Ill. App. 3d
820, 649 N.E.2d 74 (1995).
 But even where prima facie evidence of abuse or neglect is
presented, it creates only a rebuttable presumption that may be
overcome by the introduction of other evidence. In re Edricka
C., 276 Ill. App. 3d 18, 657 N.E.2d 78 (1995); In the Interest of
Simmons, 127 Ill. App. 3d 943, 469 N.E.2d 215 (1984).
 In the case before this court, the evidence presented showed
that Kimberly M. had been using cocaine on a regular basis,
though there was no evidence that she was using drugs in the
presence of her children. In fact, Stone testified that D.G.
told her that he never saw anyone use drugs at his home.
 Clearly, Kimberly had given birth to two children who tested
positive for the presence of cocaine. That fact, alone, was
prima facie evidence that Christine M. and Derrick G. were
neglected, and it was admissible evidence to be considered on the
issue of the neglect of K.G. and D.G. 
 The trial court recognized Kimberly's drug use created prima
facie evidence of neglect. It went on to find the drug-exposed
births of Christine M. and Derrick G. were not enough, without
more, to create an injurious environment or substantial risk of
harm to K.G. or D.G. We note that K.G. was seven years old at
the time of the adjudicatory hearing. D.G. was 12.
 In addition, according to three urine drops obtained from
Kimberly since March 1995, she had stopped using cocaine. She
satisfactorily completed a drug treatment program in August 1995,
and it appeared that she had maintained a drug-free environment
for her children.
 We find it significant that no effort ever was made to
remove Kimberly's children from her care, due to her drug use,
before Derrick's death.
 The remaining concern is whether the circumstances
surrounding Derrick G.'s death should be deemed abuse, which
would establish a prima facie case of neglect for his siblings.
 The Juvenile Court Act defines an abused minor as one whose
parent or guardian: (1) inflicts, causes to be inflicted, or
allows the infliction of physical injury on the minor by other
than accidental means; (2) creates a substantial risk of physical
injury to the minor by other than accidental means; and (3)
commits or allows to be committed any sex offense against the
minor. 705 ILCS 405/2-3(2)(i), (ii), and (iii) (West 1994).
 The evidence presented at the adjudicatory hearing supports
a finding that Derrick G. died accidentally, from asphyxia due to
overlay. Both the medical examiner and the expert witness said
so. There was no evidence presented to dispute Kimberly's claim
that Derrick died while they slept together on the couch. 
 The trial court found that Derrick's death did not result
from an act of negligence. It found there was no evidence that
Kimberly failed to exercise the degree of care necessary under
the circumstances. We cannot say this conclusion was against the
manifest weight of the evidence. As noted, both the medical
examiner and the expert witness pronounced Derrick's death
accidental. The expert testified that co-sleeping was not
detrimental and, in some cases, was beneficial to an infant. We
do not see any facts that require a conclusion that anything
Kimberly did in connection with Derrick's death would create a
substantial risk of physical harm to K.G. and D.G.
 CONCLUSION
 It is not our role to second-guess the trial judges who see
the witnesses and hear the testimony. Our review of the record
does not clearly demonstrate that a result opposite to the one
reached by the trial court would be the proper one. For that
reason, we affirm the trial court's order dismissing the Petition
for Adjudication of Wardship.
 AFFIRMED
 McNAMARA and BURKE, JJ., concur.